**UNITED STATES of America,
Appellee,**

v.

**James Ellsworth JONES, Appellant.**

**No. 73–2220.**

United States Court of Appeals,
Fourth Circuit.

Argued Nov. 8, 1974.

Decided Jan. 7, 1975.

Certiorari Denied April 28, 1975.

See 95 S.Ct. 1684.

---

Glenn M. Hodge, Harrisonburg, Va. (W. W. Wharton, Harrisonburg, Va. [Court-appointed counsel], and Wharton, Aldhizer & Weaver, Harrisonburg, Va., on brief), for appellant.

Leigh B. Hanes, Jr., U. S. Atty. (Ronald D. Hodges, Asst. U. S. Atty., on brief), for appellee.

Before BRYAN, Senior Circuit Judge, and CRAVEN and FIELD, Circuit Judges.

ALBERT V. BRYAN, Senior Circuit Judge:

Prosecuted for kidnaping as it is condemned in 18 U.S.C. § 1201, James Ellsworth Jones was returned guilty by a jury and sentenced to life imprisonment. The judgment will be affirmed.

His defense at trial and here is twofold: (a) that due to amnesia he was so mentally incompetent as to be unable to assist in his own defense, and (b) the evidence did not establish, beyond a reasonable doubt, the indictment crime: that he unlawfully abducted Leland Norris Davenport and willfully transported him while alive across the State lines. The first contention is altogether overridden by the contrary finding of the District Judge in a procedurally correct inquisition and upon clear and convincing testimony. *See* 18 U.S.C. § 4244. As to both the seizure and interstate removal the evidence, although wholly circumstantial, was substantial and plenteously adequate to allow the jury to say he was guilty beyond a reasonable doubt.

The statute's now pertinent parts are these:

"§ 1201. Kidnaping

(a) Whoever unlawfully seizes, confines, inveigles, decoys, kidnaps, abducts, or carries away and holds for ransom or reward or otherwise any person, . . . when:

(1) the person is willfully transported in interstate . . . commerce;

\*   \*   \*   \*   \*   \*

shall be punished by imprisonment for any term of years or for life.

(b) With respect to subsection (a)(1), above, the failure to release the victim within twenty-four hours after he shall have been unlawfully seized, confined, inveigled, decoyed, kidnaped, abducted, or carried away shall create a rebuttable presumption that such person has been transported in interstate . . . commerce."

Leland Norris Davenport was a young employee of a filling station at Mint Springs, just off Highway I–81, near Staunton, Virginia. Murdered, he was found on May 25, 1972 lying in a ditch alongside this roadway and within West Virginia. Measured along this route, the point is more than 120 miles northwardly from Mint Springs; it was near Martinsburg, West Virginia. The evidence teems with proof that the murder was the work of Jones. However, that is not this case, for he was not accused of homicide.

The crucial questions are (1) whether Jones seized Davenport in Virginia and willfully transported him into West Virginia, and (2) if so, whether Davenport was alive when so transported. Obviously, even if Jones did carry him into West Virginia, still if Davenport was dead when he left Virginia, Jones could not be held guilty of Federal kidnaping. On the other hand, if Davenport was abducted by Jones, then the statute prima facie presumed that he was transported interstate, for he was not released within 24 hours. 18 U.S.C. § 1201(b). Appellant maintains that the Government failed to show that Davenport was alive when taken into West Virginia, and hence Jones cannot be convicted as indicted under 18 U.S.C. § 1201(a).

Davenport was the only attendant on duty at the filling station on the night of May 24–25, 1972. He was last seen alive about 1:45 o'clock, A.M. on May 25, 1972 when a patron stopped there and talked with him. Soon afterwards another customer came to the station, looked around for the one in charge but could find no-

body there. Inside, the place was in disarray. The telephone receiver was dangling off the hook. On the floor was Davenport's cap, a credit card clipboard and, near the phone, a scrap of paper on which Davenport had written what looked to be a computation of a tire price. The cash register was open, with coins only in it, although the station owner had left about $150.00 of paper currency in it before leaving for the evening.

Just after midnight a small, foreign car had been seen in a bay area outside the station, jacked up as if undergoing repairs. A used tire was on the ground nearby, while a new one of the same design had been taken from the rack. Both tires were of the Volkswagen type. Moreover, the price of that tire was the same as that which Davenport had written on the piece of paper found in the station.

The telephone operator at Staunton had received a request from Davenport, whom she knew, about two o'clock A.M., to place a call for him to a number he gave as that of the BankAmericard agency used by the station to verify credit cards. Unsuccessful in reaching the number, the operator rang the station back but obtained no response. Her equipment signaled that the station's receiver was off the hook.

Just before five o'clock the same morning, a West Virginia State Patrol driver going northwardly on I–81 saw a Volkswagen headed in the same direction but stopped on the shoulder of the righthand lane with no lights burning. This location was estimated as 1.4 miles north of the West Virginia-Virginia (east-west) line, which is 100 miles, more or less, north of Mint Springs. Only one person was seen at the small car.

An hour later, about six o'clock, the same patroller stopped on I–81 to assist a man then pushing a Volkswagen with its lights off, northward along the right edge of the road. This was approximately 17 miles north of the Virginia line. He explained his predicament as

lack of oil. In the patrol car the two drove to a service station, returning together with oil. But the Volkswagen could not be started. At his request the State Trooper called a wrecking vehicle which arrived in about 20 minutes.

During the wait the two men sat in the State car. Jones said he wanted to dispose of the Volkswagen at the nearest junk yard. The patroller saw oil spots on the road. He saw, too, blood on the "back part" and "on the side" of the passenger's seat, on the running board on the passenger's side, and "a little bit on the side of his head up there . . right about his right ear". The Volkswagen driver was identified as the appellant Jones. When the wrecker arrived Jones rode with him, and the patroller left them both.

The Volkswagen was hauled to Martinsburg. When paying the wrecker Jones displayed a roll of paper money which appeared to be about $150 in amount. He transferred his "things"—a pile of clothes and two suitcases in the back seat—into a taxicab, which he took immediately, saying he wished to go to New York. He continued in the taxi as far as Hagerstown, Maryland where, he was told, he could obtain an earlier bus for New York than was available in Martinsburg. Finally, he had the taxi take him to Stroudsburg, Pennsylvania where it dropped him.

After leaving Jones with the taxi, the wrecker parked the Volkswagen in front of his father's residence in Martinsburg. The wrecker went back to his place of employment a few minutes after eight o'clock A.M. and was absent from the Volkswagen until five P.M. Then he looked over it again, seeing blood on the gear shift, between the seats, and "a lot of blood underneath the seat cover". The "seat was tore up on the driver's side of the car." The blood was still wet. The wrecker then called the sheriff and took the Volkswagen to the State Police Barracks.

At the trial, a tire expert estimated that one of the tires taken from the Volkswagen had been driven "some-where between 100 and 250 miles". The distance between Mint Springs, Virginia and Martinsburg, West Virginia is 123 miles.

After the report by the wrecker, Davenport's body was found by State Troopers and seen by the medical coroner about 8 o'clock P.M. on May 25—the day of his disappearance. He had been shot twice with a .38 caliber revolver—once in his back and again in the left front chest. There were powder burns about the wounds, indicating they had been inflicted at a short distance. Numerous scuff marks were on his elbows and knees, as well as on his back. The coroner thought that the marks on the right elbow and back could have been caused prior to death, and the ones on the knees and left elbow after death. There were also abrasions on his back which, on account of signs of hemorrhaging, led the doctor to believe that they were suffered while Davenport was living. "In other words, his body could still pump blood through these areas." He explained that the first shot involved an injury to the lung, resulting in mass bleeding. All of the blood proved to be of Davenport's type.

When the coroner first saw the deceased he was lying in a small ditch where the State Troopers had first discovered the body. In this locality—a "pull-off section of the road"—he saw oil stains on the road as well as a "rather large blood stain". The grass "had been bent down towards the body in a general curve from the road down toward where the body was lying." Near the body was a blood-stained shirt. He had on a wristwatch showing the date of May 25, 1972. It had stopped at 4:50—whether A. M. or P. M. was undeterminable. Following this inspection the body was taken to a funeral home for further viewing. No fingerprints of Davenport were detected on the car. The bullets were removed by the coroner from the body and ballistics tests established that they were discharged from the revolver which was found in the possession of Jones when he was arrested.

Upon the same side of Highway I–81 on which the body was later seen—16 miles to the south, but still in West Virginia, and 1.4 miles north of the Virginia line—buttons and pieces of a station attendant's type shirt, such as Davenport was wearing, were found. Also, there was a ballpoint pen carrying the advertisement of the Mint Springs filling station and, in addition, pieces of crystal which fitted into Davenport's watch. No blood was proved to be there.

Jones was arrested in Milford, Pennsylvania on August 6, 1972 hiding in a tree, from which he fell 40 feet and dropped a number of personal belongings. Among them was a BankAmericard, whose agency Davenport on the morning of May 25 had attempted to contact by telephone, and a .38-revolver.

■ Appraising the case overall, with this proof before the jury we think the District Court rightfully refused to direct a verdict of acquittal.

The evidence was amply sufficient to allow the jury, if it saw fit, to find that Jones had abducted Davenport. Plainly, it was to his advantage to prevent the escape of Davenport, so that his crimes at the station could not be reported. The presence within West Virginia of the watch crystal parts, the shirt shreds and the ballpoint pen were reasonably acceptable clues of the abduction. This is true as well of the new tire on the Volkswagen and the roll of paper currency in Jones' possession.

Nor can it be said that there was no reasonable basis on which the jury could have thought Davenport alive as he was taken across the border of the States. Existence of the recited clues is acceptable as initial indicia of murderous assault upon Davenport. It certainly bears signs of bodily combat and occurred one mile within West Virginia. No blood was descried in Virginia and none was observed until 17 miles within West Virginia, that is, where the lifeless body lay.

Between the State Trooper's first and second sights of the Volkswagen was 16 miles of distance and the interval between his appearances was an hour. These spaces of place and time afforded the murderer opportunity aplenty to leave unnoticed the corpse where it was finally laid. That where Davenport was then lying—within West Virginia territory—was his last place of life is suggested by the coroner's opinion testimony: that some circulation of blood may have been in the body just before it was put in the ditch.

■ Confessedly, these considerations and conclusions are exclusively in the province of the jury, not to be poached upon by the courts. So it is not for this court to say whether these are logical postulates. However, mention now is simply to demonstrate that the verdict is predicable upon a non-frivolous foundation. The only obligation of the courts is to ascertain if the evidence of guilt was so substantial as to permit the jury, if it was so convinced, to render a verdict of guilty. If proof is wanting in this regard, then the courts must intervene; otherwise they become trespassers. Glasser v. United States, 315 U.S. 60, 80, 62 S.Ct. 457; 86 L.Ed. 680 (1942); United States v. Sherman, 421 F.2d 198, 199 (4 Cir. 1970), cert. denied, 398 U.S. 914, 90 S.Ct. 1717, 26 L.Ed.2d 78 (1970).

While alone upon this aggregate of facts there was enough to take the case to the jury on the charge of Federal kidnaping, this determination is buttressed by inferences and presumptions of law.

For example in United States v. Rees, 193 F.Supp. 849, 859 (D.C.Md.1961, opinion by Thomsen, Ch. J.), the Court declared that the place where the dead body is found is presumed to be the place of death. The likeness of the circumstances of that case corroborates the correctness of the result presently. Judge Thomsen cited apt precedents which were persuasive, such as Breeding v. State, 220 Md. 193, 200, 151 A.2d 743, 747 (1959); and People v. Peete, 54 Cal. App. 333, 202 P. 51, 64 (1921), even though they chiefly related to the venue of local crimes.

The coroner's observation that there may have been some circulation of blood in Davenport's body just before it was put in the ditch, becomes of particular force with the holding of Allen v. Mazurowski et al., 317 Mass. 218, 57 N.E.2d 544 (1944) that there is a presumption that a person is living until the contrary is shown. Applied here, the presumption of law is that Davenport was alive in the ditch until his death there appeared.

Although noted, we find without merit the appellant's error assignments relating to the admission of certain evidence and to the argument of the prosecuting attorney. The judgment of the District Court will be approved.

Affirmed.