**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,
          *Plaintiff-Appellee,*

v.

JAMES HORTON,
          *Defendant-Appellant.*

No. 01-4681

Appeal from the United States District Court
for the District of Maryland, at Baltimore.
Alexander Williams, Jr., District Judge.
(CR-00-105-AW)

Argued: December 6, 2002

Decided: March 10, 2003

Before WILKINS, Chief Judge, and MICHAEL and
KING, Circuit Judges.

_____

Affirmed by published opinion. Chief Judge Wilkins wrote the majority opinion, in which Judge King joined. Judge Michael wrote a dissenting opinion.

_____

## COUNSEL

**ARGUED:** Thomas J. Saunders, Baltimore, Maryland, for Appellant. Deborah A. Johnston, Assistant United States Attorney, Greenbelt, Maryland, for Appellee. **ON BRIEF:** Thomas M. DiBiagio, United States Attorney, Odessa P. Jackson, Assistant United States Attorney, Greenbelt, Maryland, for Appellee.

**OPINION**

WILKINS, Chief Judge:

James Horton appeals his convictions for kidnapping resulting in death, *see* 18 U.S.C.A. § 1201(a)(1) (West 2000), and conspiracy to commit kidnapping, *see* 18 U.S.C.A. § 1201(c) (West 2000). Finding no error, we affirm.

I.

In late November 1998, Stephen Satcher visited his cousin Daniel Stancil and asked Stancil to help him bring some "bodies" from Maryland to North Carolina in exchange for a quantity of cocaine. J.A. 69. Stancil in turn asked his friend, Horton, if he would assist, and Horton agreed. Once Stancil and Horton arrived in Maryland, Satcher informed them that the person whose body they were to dispose of was Jovita Dickerson, the still-living mother of Satcher's child. Stancil and Horton then agreed to assist in kidnapping Dickerson.

On the afternoon of December 4, 1998, Horton, Satcher, and Stancil drove to a parking lot in Bowie, Maryland, and waited for Dickerson to emerge from her workplace. Horton, armed with a toy firearm, forced Dickerson into her vehicle and held her there while Satcher drove them to Satcher's stepfather's house in Cheverly, Maryland. When Stancil arrived, he found Horton, Satcher, and Dickerson in the basement; Dickerson was on her knees bent over a couch with her hands tied behind her back. Stancil immediately returned upstairs, where he heard choking sounds coming from the basement. Horton joined Stancil upstairs a few minutes later and reported that Satcher had tried to choke Dickerson.

After Satcher and Stancil were unsuccessful in a second attempt to kill Dickerson, Satcher instructed Horton to "finish her off." *Id.* at 117. Horton then went down to the basement for two to three minutes, after which he returned upstairs and said he "was finished." *Id.* at 118. He and Satcher then carried Dickerson from the basement and placed her in the trunk of her vehicle. Stancil later stated that at that point

"she looked dead." *Id.* at 194. Stancil and Horton then drove the vehicle to North Carolina, where they stayed in a hotel for the night. The next morning, after determining that their victim was in fact dead, they set the vehicle on fire in a field in Wake County with Dickerson's body still in the trunk. Dickerson's vehicle and her body were discovered later the same morning.

## II.

The Federal Kidnapping Act establishes criminal penalties for a person who "unlawfully seizes, confines, inveigles, decoys, kidnaps, abducts, or carries away and holds for ransom or otherwise any person . . . when . . . the person is willfully transported in interstate . . . commerce, regardless of whether the person was alive when transported across a State boundary if the person was alive when the transportation began." 18 U.S.C.A. § 1201(a).[1]

---

[1]Section 1201(a), in its entirety, states:

(a) Whoever unlawfully seizes, confines, inveigles, decoys, kidnaps, abducts, or carries away and holds for ransom or reward or otherwise any person, except in the case of a minor by the parent thereof, when—

(1) the person is willfully transported in interstate or foreign commerce, regardless of whether the person was alive when transported across a State boundary if the person was alive when the transportation began;

(2) any such act against the person is done within the special maritime and territorial jurisdiction of the United States;

(3) any such act against the person is done within the special aircraft jurisdiction of the United States as defined in section 46501 of title 49;

(4) the person is a foreign official, an internationally protected person, or an official guest as those terms are defined in section 1116(b) of this title; or

(5) the person is among those officers and employees described in section 1114 of this title and any such act against the person is done while the person is engaged in, or on account of, the performance of official duties,

shall be punished by imprisonment for any term of years or for life and, if the death of any person results, shall be punished by death or life imprisonment.

A.

Horton argues that "the transportation" of Dickerson commenced when her body was put in the trunk of her vehicle at Satcher's stepfather's house in Cheverly, Maryland, and therefore no violation of § 1201(a)(1) occurred because Dickerson was already dead at that point. He further alleges that the jury instructions given by the district court wrongfully precluded him from presenting this defense.[2]

We review de novo the correctness of jury charges regarding the elements of an offense. *See United States v. Ellis*, 121 F.3d 908, 923 (4th Cir. 1997). In so doing, we must give the applicable statute its plain meaning. *See United States Nat'l Bank of Or. v. Indep. Ins. Agents of Am., Inc.*, 508 U.S. 439, 454 (1993). And, in order to determine the plain meaning of a statute, we must consider its "language, structure, and purpose." *United States v. Ehsan*, 163 F.3d 855, 858 (4th Cir. 1998). If after such consideration we are left with a "grievous ambiguity or uncertainty" in the meaning of the statute, the rule of lenity requires us to adopt the construction most favorable to the defendant. *Chapman v. United States*, 500 U.S. 453, 463 (1991) (internal quotation marks omitted).

---

[2]Horton argues that the district court erred by (1) giving a jury instruction that would allow conviction if the jury found that he kidnapped Dickerson, transported her within Maryland, killed her, and then transported her body outside the state; and (2) refusing to instruct the jury that it must acquit unless it found beyond a reasonable doubt either that the conspirators intended to carry Dickerson alive across state lines or that Dickerson was actually alive during the commencement of her transportation across state lines.

Horton also argues that the district court responded incorrectly to a question submitted by the jury during deliberations, inquiring, "[A]t what . . . point does transportation in this case begin[ ]?" J.A. 419 (internal quotation marks omitted). The district court instructed the jury that "[a] defendant transports a victim when he willfully moves her. Therefore, transportation commences with the movement of the victim, at any point during the kidnapping." *Id.* at 435 (internal quotation marks omitted). Horton argues that the court should have responded by stating that "[i]f, after . . . Dickerson was kidnapped, but before transportation is initiated which carries her across state lines . . . Dickerson dies, then there cannot be any interstate transportation of the victim." *Id.* at 481.

The statutory language in question here is ambiguous when viewed outside the context of the purpose of the statute. It is apparent that "the transportation" in § 1201(a) refers to the only transportation previously referenced in the statute, namely interstate transportation. However, the statutory language does not clarify whether, when a kidnapper moves his victim after abducting her and then stops at some point before transporting her out of the state, "the transportation" includes only the last leg of the journey or all of the movement from the scene of the abduction across the state border. Nor does the structure of the statute suggest the correct interpretation.

We therefore turn to the purpose of the statute. The Federal Kidnapping Act was promulgated to address an increasing number of interstate kidnappings and the problem of kidnappers taking their victims across state lines, to places where state law enforcement officers had no authority to investigate the crimes and pursue the criminals. *See Chatwin v. United States*, 326 U.S. 455, 462-63 (1946). Congress' authority to address this problem falls under its power to prevent the misuse of channels of interstate or foreign commerce. *See Perez v. United States*, 402 U.S. 146, 150 (1971); *United States v. Toledo*, 985 F.2d 1462, 1466 (10th Cir. 1993); *cf. Brooks v. United States*, 267 U.S. 432, 438-39 (1925) (holding that prohibition on interstate transportation of stolen automobiles is within Commerce Clause power in part because it helps prevent criminals from using channels of interstate commerce to move stolen property outside of the jurisdiction of state law authorities and to conceal their crimes). Congress amended the statute in 1972, expanding its scope. *See* Act for the Protection of Foreign Officials and Official Guests of the United States, Pub. L. No. 92-539, § 201, 86 Stat. 1070 (1972). As the statute was amended, interstate transportation of the victim became "merely a basis for federal jurisdiction rather than an integral part of the substantive crime." *United States v. Wills*, 234 F.3d 174, 176 (4th Cir. 2000) (internal quotation marks omitted); *see* S. Rep. No. 92-1105 (1972), *reprinted in* 1972 U.S.C.C.A.N. 4316, 4317-18. As a result of that change, courts have held that a defendant need not even realize he has left the state of abduction in order for the interstate transportation element to be satisfied. *See, e.g.*, *United States v. Duncan*, 855 F.2d 1528, 1536-38 (11th Cir. 1988); *see also United States v. Darby*, 37 F.3d 1059, 1067 (4th Cir. 1994) ("Numerous cases have held that criminal statutes based on the government's interest in regulating interstate com-

merce do not generally require that an offender have knowledge of the interstate nexus of his actions.").

The statute was again amended in 1998 to provide that the interstate element is satisfied when a person is willfully transported in interstate commerce "regardless of whether the person was alive when transported across a State boundary if the person was alive when the transportation began." Protection of Children from Sexual Predators Act of 1998, Pub. L. No. 105-314, § 702(a), 112 Stat. 2974, 2987 (1998). Prior to the amendment, courts had held that the government was required to prove that the kidnapping victim was alive when the victim crossed a state line. *See, e.g.*, *United States v. Jones*, 508 F.2d 1271, 1273 (4th Cir. 1975). It is apparent that in passing the 1998 amendment, Congress recognized the difficulty of proving the exact events that took place once a kidnapper was "on the move" with his victim, and sought to relieve the burden on the government of proving these events.

Consideration of the purposes behind § 1201 and its amendments demonstrates the incorrectness of Horton's interpretation of the statute. There is no basis for the proposition that interruptions between the commencement of movement of the victim and the crossing of a state line affect when the interstate transportation commenced, even when the path from the place of abduction to the state line is not straight. Were we to rule otherwise, we would thwart Congress' attempt to relieve the government from proving the specific events that occurred during a kidnapper's movement of his victim. We would force the government in every federal kidnapping case to prove beyond a reasonable doubt that the kidnappers did not kill their victim during a significant pause in their travel or on a circuitous path to the state line. This would be at odds with Congress' goal of preventing kidnappers from misusing interstate commerce channels to avoid responsibility for their kidnappings.

Consider the following hypothetical: The government introduces evidence showing only that Kidnapper grabbed Victim and drove off with her and that her body was found two days later in a neighboring state. Certainly this is the quintessential case that the federal kidnapping statute is designed to address. Horton's interpretation, however, could prevent a successful prosecution in such a case because the

government could not establish beyond a reasonable doubt that Kidnapper did not stop somewhere within the state where the abduction occurred, kill Victim, and then transport her body to the neighboring state to dispose of it.

Of course, the longer the pauses, or the more changes of direction or changes in the kidnapper's plans that occur during the transportation from the point of abduction to the state line, the easier it would be to say—from a purely linguistic standpoint—that there may have been multiple transportations rather than a single interstate transportation and therefore that the first leg of the transportation was not part of "the transportation" to which the statute refers. But again, making application of the statute depend on these factors would not serve the purpose of preventing kidnappers from misusing interstate commerce channels to prevent state law enforcement authorities from bringing them to justice.[3] We therefore conclude that the district court correctly charged the jury that "the transportation" of Dickerson began when she was willfully moved from the place of her abduction.[4]

---

[3]The dissent concludes that, under our interpretation, the statute would apply in the hypothetical case of a kidnapper who seizes his victim in one state, transports her within that state, and then kills and buries her, only to return one month later and move the body to another state. *See post*, at 10-11. We do not find this outcome as troubling as the dissent does, however. We see no reason why Congress would not have intended the statute to reach such a misuse by a kidnapper of interstate commerce channels to cover up his trail by moving evidence of his crime into a different state's jurisdiction.

[4]Horton contends that the Government's interpretation would make surplusage of the language "if the person was alive when the transportation began" because in any interstate transportation of a kidnapping victim, the victim would be alive when the transportation began. That misconstrues the requirements of the statute. If, for example, Victim goes to Kidnapper's house voluntarily, after which Kidnapper holds her against her will in an attempt to obtain a ransom for her safe release, that would meet the non-jurisdictional elements of § 1201(a). *See* 18 U.S.C.A. § 1201(a) (making it a federal crime to "unlawfully . . . confine[ ] . . . and hold[ ] . . . any person" when one of five jurisdictional requirements is satisfied); *United States v. Toledo*, 985 F.2d 1462, 1466 (10th Cir. 1993) (stating that a kidnapping is complete when the victim is unlawfully seized and detained); *United States v. Hughes*, 716 F.2d

B.

Citing *United States v. Moore*, 571 F.2d 76 (2d Cir. 1978), Horton next argues that the district court violated his right to due process by instructing the jury concerning a statutory presumption allowing the jury to infer that Dickerson was transported out of the state if she was not released within 24 hours after she was abducted. *See* 18 U.S.C.A. § 1201(b) (West 2000) (creating presumption). We need not decide whether this instruction was erroneous because any error was harmless. Even without the instruction, there was no reasonable basis in the record for the jury to find that the interstate transportation element was not satisfied. *See United States v. Brown*, 202 F.3d 691, 699-701 (4th Cir. 2000) (holding that an error that "effectively withdr[aws] an element of the offense from the jury's consideration" is harmless when the record could not support a reasonable finding that the element was not satisfied).

III.

Finally, with regard to the conspiracy charge, Horton contends that the district court erred in refusing to instruct the jury that in order to convict, it would have to find either (1) that Dickerson was alive when her transportation across state lines began, or (2) that when the conspiracy to kidnap Dickerson began, Horton had intended to carry Dickerson across state lines. Again, we need not decide whether the refusal to provide this instruction constituted error because any error was harmless. In convicting Horton on the § 1201(a) charge, the jury necessarily determined that Dickerson was alive when the interstate transportation began, *i.e.*, when she was moved from the place of her abduction. *See id.* at 699-700 (explaining that error that "effectively withdr[aws] an element of the offense from the jury's consideration" is harmless if jury necessarily made the required finding anyway or if the record could not support a reasonable finding that the element was not satisfied).

234, 238 (4th Cir. 1983) (same). If Kidnapper subsequently killed Victim at his house prior to transporting her body to another state, the interstate jurisdictional element would not be satisfied because Victim would not have been alive when the transportation began.

IV.

In sum, we affirm Horton's convictions for the reasons stated.

*AFFIRMED*

MICHAEL, Circuit Judge, dissenting:

I respectfully dissent because the majority extends federal jurisdiction over the crime of kidnapping further than Congress intended. It is true that federal jurisdiction exists "regardless of whether the [kidnap victim] was alive when transported across a State boundary if the [victim] was alive when the [interstate] transportation began." 18 U.S.C. § 1201(a)(1). This statutory language, however, does not sanction the majority's holding that interstate transportation begins when the live victim is "willfully moved from the place of her abduction," *ante* at 7, so long as the defendant eventually carries the victim or the victim's body across state lines. This formulation erroneously sweeps in a kidnapping that is begun and ended in one state, but is followed at some point by the movement of the victim's body across state lines. James Horton argues that there is no federal jurisdiction in this case because the interstate transportation (the movement of Jovita Dickerson's corpse) did not begin until after the intrastate kidnapping had ended. Because the district court's instructions did not allow the jury to decide when the interstate transportation began, I would grant Horton a new trial.

I.

The federal crime of interstate kidnapping has three distinct elements. The victim must (1) be "kidnap[ped]," (2) be held "for ransom or reward or otherwise," and (3) be "willfully transported in interstate . . . commerce." 18 U.S.C. § 1201(a)(1). The third element, which is at issue here, allows for federal jurisdiction. Congress amended the statute's jurisdictional provision in 1998 to provide that interstate transportation occurs "regardless of whether the [victim] was alive when transported across a State boundary if the [victim] was alive when the transportation began." *Id.* Prior to this amendment the government was required to prove that the victim was still alive when the

kidnapper crossed state lines. Now, the focus is on whether the victim was alive when interstate transportation began, raising the new question of when interstate transportation begins. The 1998 amendment has thus moved the focus of the jurisdictional element away from the point where the kidnapper crosses the state border to the point where his journey to the border begins. This shift expands the scope of the federal kidnapping offense to include the case where the victim dies before the state line is crossed, as long as the kidnapper starts the interstate leg of his trip while the victim is alive. The 1998 amendment, however, did not extend federal kidnapping jurisdiction to include a kidnapping begun and ended with no interstate transportation, but followed by the movement of the victim's body across state lines. The question, therefore, is how to distinguish these two categories of cases: interstate kidnapping and intrastate kidnapping followed by the movement of a body across state lines.

The majority fails to make a distinction between the two kinds of cases. Under the majority's view, any movement of the victim is the beginning of transportation in interstate commerce (assuming, of course, that the defendant carries the victim, or the victim's body, across state lines at some point). In most cases it will be irrelevant whether the movement of the victim involved one journey or two. Specifically, it will usually be irrelevant whether stops in movement were distinct breaks, separating the trip into multiple journeys, or whether the stops were merely pauses in furtherance of a single journey. As long as the victim remains alive, the details of the journey will not be important. However, when the victim dies after abduction, there is the possibility that the kidnapping will have ended before the jurisdictional element was satisfied.

An example demonstrates why we cannot gloss over the question of when interstate transportation begins. Suppose that a kidnapper seizes his victim in a particular state, transports her to another location within that same state, and then kills and buries her. A month later the kidnapper digs up the body and moves it across state lines. The kidnapping is purely an intrastate crime, completed with the death and burial of the victim; the kidnapping was simply followed by the separate act of interstate transportation of a corpse. The majority, however, as I read its opinion, would say that interstate transportation "of [the victim] began when she was willfully moved from the

place of her abduction." *Ante* at 7. The majority, in other words, would allow the initial intrastate movement to satisfy the statutory requirement that "the [victim be] alive when the transportation beg[i]n[s]." In my example, according to the majority, the kidnapping — for federal jurisdictional purposes — would continue after the victim's death, even though she was dead (and buried) for a month before transportation resumed.

The majority interprets the new jurisdictional provision so broadly, it says, because anything else "would force the government in every federal kidnapping case to prove beyond a reasonable doubt that the kidnappers did not kill their victim during a significant pause in their travel or on a circuitous path to the state line." *Ante* at 6. But my example presents much more than a "pause in [the] travel" or a "circuitous path to the state line." The interstate journey is altogether different from the intrastate journey that brought the victim to the place of her death and burial. The interstate journey did not begin when the kidnapper first moved the victim from the place of abduction. Rather, it only began when the kidnapper set out on the journey that took him across state lines — weeks after the victim's death and weeks after the completion of the kidnapping.

The significance of the break in the kidnapper's travels in my example distinguishes it from the "quintessential case" described by the majority. *See ante* at 6 ("Kidnapper grabbed Victim and drove off with her and . . . her body was found two days later in a neighboring state."). The length of the break is relevant, but more important is whether the break was in furtherance of the journey itself. A kidnapper's periodic stops to eat, sleep, get gas, or simply hide and watch do not break a single trip into multiple journeys; instead, they are pauses that form part of the same journey. In contrast, the kidnapper in my example did not take a break as part of his trip. He completed one intrastate journey, killed his victim, and brought the kidnapping to a close. His interstate journey followed the completion of the kidnapping offense, and therefore that second journey cannot satisfy the jurisdictional element of the statute.

These questions — when a defendant set out on a single journey that took him across state lines and when a stop acted to break a trip into more than one journey — are questions for the jury. They are a

matter of common sense, and juries will not be distracted by each stop for gas or food. Travel is a common experience, and jurors will be able to determine when a stop is part of an interstate trip and when it is the end of an in-state trip. This is not an unusual task for a jury. For example, when juries decide whether or not a felony has terminated in a felony murder case, they routinely determine if specific acts are discrete offenses or part of one ongoing crime. *See* Erwin S. Barbre, Annotation, *What Constitutes Termination of Felony for Purpose of Felony-Murder Rule*, 58 A.L.R.3d 851 (1974). Determining when interstate transportation began is quite similar.

My reading of the statute does not prevent the prosecution of Horton or place an unreasonable burden of proof on the government in this case. After all, the government contends that "all of the evidence . . . and the circumstances indicate that [Dickerson] was alive even when she was put in the trunk" at Cheverly, Maryland. J.A. 305. Under this theory the government would only have to show that when Horton left Cheverly with Dickerson in the trunk, he was beginning a journey across state lines. This chain of events would look much like the "quintessential case" cited by the majority. Alternatively, the government could argue that the stop in Cheverly was not a sufficient break in the journey to serve as the completion of a kidnapping, even if Dickerson might have died while in the house in Cheverly. *See California v. Barnett*, 954 P.2d 384, 464 (Calif. 1998) ("[A] kidnapping does not terminate until the victim is released or otherwise disposed of and the kidnapper reaches a place of temporary safety."). There is evidence for the jury to believe either scenario, and either one satisfies the jurisdictional element. Neither requires the government to pinpoint the time and place of Dickerson's death.

We can all agree that the basic purpose of the federal kidnapping statute is to prevent kidnappers from misusing the channels of commerce by "taking their victims across state lines, to places where state law enforcement officers ha[ve] no authority to investigate the crimes and pursue the criminals." *Ante* at 5. The 1998 amendment furthers this purpose, as the majority explains, by relieving the government of the burden to prove "the exact events that took place once a kidnapper was 'on the move' with his victim." *Ante* at 6. The government must nevertheless prove an interstate connection by showing that the kidnapper began an interstate journey while his victim was alive. When

the kidnapping journey begins and ends within a single state, there is no federal jurisdiction, and that case must still go to the local authorities.

## II.

The majority's decision — that the jurisdictional element can be satisfied by any movement of the victim, as long as the defendant eventually carries the victim, or the victim's body, across state lines — leads it to the erroneous conclusion that the final jury instructions on interstate transportation were correct.

The district court's initial jury instruction on transportation (for the kidnapping charge) explained that the government did not have to prove that Dickerson "was alive at the time she crossed state lines," but it did have to prove that "she was alive when the transportation of her began." J.A. 345. The court went on to say that the government simply had to show "that at some point after the kidnapping began," the victim "was moved from one state to another." J.A. 346. After the jury had deliberated for about two hours, it sent the following question to the court: "at what . . . point does transportation *in this case* begin[ ]?" J.A. 419 (emphasis added). The court, over Horton's objection, gave the following supplemental instruction: "A defendant transports a victim when he willfully moves her. Therefore, transportation commences with the movement of the victim, at any point during the kidnapping." J.A. 435-36. This instruction was erroneous. In effect, it required the jury to find that interstate transportation began with the first movement of Dickerson, right after she was seized at her workplace in Bowie, Maryland. This instruction conflated interstate transportation with any movement of the victim, and it took from the jury the question of when interstate transportation began.

The district court's instructions — also given over Horton's objection — on the federal kidnapping conspiracy charge are also in error. To satisfy the interstate element of such a charge, the government may prove one of two things. First, it may prove that the defendant agreed to participate in a kidnapping and that the kidnapping fell within one of the federal jurisdictional provisions. *See, e.g.*, *United States v. Davis*, 19 F.3d 166, 170 (5th Cir. 1994); *United States v. Bankston*, 603 F.2d 528, 532 (5th Cir. 1979). In such a case, the

defendant is not required to have knowledge that the kidnapping satisfied the federal jurisdictional element. *Bankston*, 603 F.2d at 532. This essentially requires the government to prove that Horton intended to commit some sort of kidnapping and that the conspirators actually committed a federal kidnapping. Second, the government may prove that the conspirators planned to transport the victim across state lines and that one conspirator committed an overt act in furtherance of the conspiracy. *United States v. Moore*, 571 F.2d 76, 90 (2d Cir. 1978). This second approach requires the government to prove that Horton actually intended to commit a federal kidnapping, but it does not require proof that a federal kidnapping actually occurred. The district court's instructions blended the two (alternative) bases for proving jurisdiction on the conspiracy count, thereby failing to state all of the components of either one. The district court explained that in order to find that Horton was a member of an interstate kidnapping conspiracy, "[i]t is not necessary that [he] know of the interstate nature of the plan to kidnap so long as he knew the general nature and scope of the conspiracy." J.A. 353. The court then required only that the government prove that one of the conspirators committed "at least one . . . overt act[ ]." J.A. 356. The court coupled the more lenient intent requirement of the first basis for jurisdiction with the more lenient overt act requirement of the second basis. This meant that the government did not have to prove fully either jurisdictional basis for a federal kidnapping conspiracy.

The supplemental kidnapping instruction and the conspiracy instruction given in Horton's trial were misleading and were incorrect statements of the law. *Cf. United States v. United Med. & Surgical Supply Corp.*, 989 F.2d 1390, 1407 (4th Cir. 1993). The errors were also prejudicial, undercutting the sole ground of Horton's defense. *Cf. id.* at 1406. Horton did not contest the facts of the case. He argued instead that, although he may have committed a kidnapping in Maryland, he did not, and never intended to, commit an interstate kidnapping. Finally, the erroneous instructions were not harmless error. I recognize, of course, that a jury instruction that removed an element of the offense from the jury can be harmless in one of two ways. First, it may be clear that other decisions made by the jury, untainted by error, required a finding of the omitted element. *See United States v. Brown*, 202 F.3d 691, 699-700 (4th Cir. 2000). This is not such a case. Both counts on which Horton was convicted are infected by the

same error; neither conviction, therefore, demonstrates that the jury concluded that the interstate element was satisfied. Second, the instructional error may be harmless if there is no evidence that could rationally support a different result than the one reached by the jury. *Id.* at 701. Again, this is not such a case. Although on remand a jury might well conclude that the crime of kidnapping had not ended before Dickerson was moved in interstate commerce, this is not an incontestable point. The question is one on which reasonable minds could differ. Indeed, the fact that the jury asked for additional instruction on the issue of interstate transportation suggests that this issue was a point of debate during deliberations.

If I agreed with the majority that the jury had been correctly instructed on the substantive count charging federal kidnapping, I might conclude that the conspiracy instruction was harmless error. It appears to be undisputed that Horton "knew the general nature and scope of the conspiracy." J.A. 353. This broad intention to participate with others in the crime, coupled with a conviction for actual commission of the crime, would allow conviction on a conspiracy charge. Because the instructions on the kidnapping charge were in error, however, Horton could have been convicted on the conspiracy charge even though the jury might have believed he committed a purely intrastate kidnapping and had no intent to commit a federal kidnapping.

### III.

Horton also argues that the district court erred by instructing the jury that it could presume that the victim had been transported across state lines if she was not released within twenty-four hours. *See* 18 U.S.C. § 1201(b). Horton argues that this instruction violates the principle that reliance on a presumption in a criminal case is only constitutional when the "presumed fact is more likely than not to flow from the proved fact on which it is made to depend." *Leary v. United States*, 395 U.S. 6, 36 (1969). *See also Moore*, 571 F.2d at 86 (concluding that the twenty-four hour presumption in the kidnapping statute is unconstitutional). The majority holds that any error in this instruction is harmless because "there was no reasonable basis in the record for the jury to find that the interstate transportation element was not satisfied." *Ante* at 8. I believe, of course, that the majority's

basis for finding harmlessness is off the mark, but I do agree, for a different reason, that any error in the instruction is harmless. In this case, it is undisputed that the kidnappers moved the victim or the victim's body across state lines within twenty-four hours. What is not clear is whether this movement began while the kidnapping was still ongoing, which is required to satisfy the jurisdictional element. Because *this* particular instruction did not remove the jurisdictional question from the jury but instead reiterated a point not disputed by the defense — that at some point within twenty-four hours of her seizure the victim or her body crossed state lines — I agree that the instruction was harmless error.

## IV.

A properly instructed jury could have concluded (1) that the kidnapping ended if and when Dickerson was killed in Cheverly, Maryland, and (2) that the interstate transportation did not begin during the commission of the kidnapping. I would therefore remand the case for a new trial on the substantive kidnapping count, with instructions that allow the jury to decide when interstate transportation began. I would also allow a new trial on the conspiracy count.