# In the
# United States Court of Appeals
## For the Seventh Circuit

No. 05-1489

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

TOMMY E. JONES,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 02 CR 895—**Rebecca R. Pallmeyer**, *Judge.*

ARGUED JANUARY 17, 2006—DECIDED JULY 18, 2006

Before BAUER, ROVNER, and SYKES, *Circuit Judges.*

BAUER, *Circuit Judge.* Tommy E. Jones sold crack cocaine to government agents. He was convicted for this and for the related act of conspiring to distribute cocaine within 1000 feet of a public housing complex under 21 U.S.C. §§ 841(a)(1) and 846. On appeal, Jones raises three issues. First, he claims the district court erred in not dismissing his indictment according to the Interstate Agreement on Detainers Act. Second, he argues that there was reversible error at trial based on evidentiary admissions and the form of the jury instructions. Third, he challenges the propriety of his sentencing hearing and the length of his term, which was set at 300 months. For the following reasons, we affirm.

## I.  Background

Between February 2000 and January 2001, Tommy E. Jones conspired with others to distribute, and possessed with the intent to distribute, cocaine and cocaine base in the Rockwell Gardens public housing building located at 340 South Western Avenue (the 340 Building) in Chicago, Illinois. During that time, narcotic sales in the 340 Building were controlled by the Gangster Disciples, a street gang to which Jones belonged.

Law enforcement authorities, including agents from the Department of Housing and Urban Development (HUD), conducted an investigatory operation at the Rockwell Gardens public housing complex from March 2000 through January 21, 2001. During this period of time, law enforcement agents surveilled the gang's activities and conducted controlled buys that yielded more than 100 grams of crack cocaine.

In the early afternoon of May 2, 2000, Jones sold crack cocaine to a federal agent in a stairwell of the 340 Building. Special Agent Kenneth Popovits, from HUD, posed as a laborer from Indiana wanting to purchase crack for redistribution. Working with a confidential informant (CI), Agent Popovits entered the 340 Building after informing a gang sentry of their supposed intentions. The gang member directed them to the building lobby, where Popovits and the CI were searched and redirected to a stairwell.

When Agent Popovits and the CI got to the stairwell, they encountered and negotiated with three men. Popovits recognized two of the men: Michael Zolicoffer and the defendant. Zolicoffer he knew from prior transactions, but Jones he recognized from intelligence photos of individuals that frequented the area. Popovits told the men that he and the CI each wanted to buy ten bags of crack cocaine. (Each bag contained one rock of crack and was valued at ten dollars.) The unknown third man provided the first six bags

to the CI, but turned to Jones to satisfy the remainder of the request. Jones completed the CI's order and then asked Popovits how much crack he still needed. Popovits told him ten. Jones then handed him ten small black bags of crack from a larger baggy. Popovits paid him $100 for his ten bags and he and the CI then left the 340 Building. The drugs obtained from Jones tested positive for 4.2 grams of cocaine base.

On the afternoon of the purchase, Agent Popovits prepared a report of the transaction. In it, he described Jones as FNU LNU No.17 (First-Name-Unknown Last-Name-Unknown): black male, six feet, one inch tall, weighing 175 lbs. A few days after his report, Popovits identified Jones in his operation's "intelligence file." The file contained photos of Rockwell Gardens' residents that had previously been arrested by the City of Chicago and the Chicago Housing Authority police departments. Popovits then gave Jones's photograph to fellow agent Fount Hankle, who placed it in a spread of four other men. Agent Popovits again picked Jones. He was one-hundred percent certain that Jones was the second man in the stairwell during the May 2 drug purchase. This entire identification process took place outside of the CI's presence.

On September 17, 2002, Jones and several co-defendants were charged in a criminal complaint for conspiracy to distribute heroin, cocaine, and cocaine base in violation of 21 U.S.C. § 846. A grand jury returned an indictment against Jones on January 16, 2003, charging him with one count of conspiracy to distribute crack cocaine within 1000 feet of a public housing complex, 21 U.S.C. § 846, and one count of distribution of crack cocaine within 1000 feet of a public housing complex, 21 U.S.C. § 841(a)(1). A superseding indictment was returned with the same charges on August 21, 2003.

Following the initial indictment, a federal detainer was lodged against Jones on October 29, 2002. The detainer was

served at Illinois River Correctional Center in Canton, Illinois, where Jones was serving time for a state conviction. The purpose of the notice was twofold: it advised Jones that he was wanted for trial on the federal charge, and it allowed him to demand a speedy trial. Jones executed the document on November 19, 2002, and delivered it to the warden of his holding institution. He was produced for trial on August 21, 2003.

At trial, the government called four witnesses: Charles Butts, Jerry Harrington, Willie Mobley, and Michael Zolicoffer. All four men testified that Jones was a fellow member of the Gangster Disciples and that he sold crack cocaine on a daily basis at the 340 Building during the spring of 2000. Further, testimony was introduced that he was known to sell crack between late 1999 and mid-year 2000. Harrington, Mobley, and Zolicoffer also stated that all gang members participated in Nation's Work, which involved selling drugs for the collective benefit of the organization. Additionally, Butts, Harrington, and Zolicoffer testified that all gang members, including the defendant, were required to attend gang meetings and work security at the 340 Building. Butts and Zolicoffer attended these meetings with the defendant between 1999 and 2000.

Aside from the drug sales, Jones occupied a position of authority within the Gangster Disciples. Harrington, Mobley, and Zolicoffer testified that Jones was a Regent, explaining that he was responsible for managing security assignments within the gang and leading meetings. Harrington also testified that he sold crack cocaine for Jones in February 2000. During the entire month, Jones supplied Harrington with 36 dime bags of crack per day. (A dime bag cost $10 and contained one rock of crack.) Harrington sold Jones's supply at night and Jones sold during the day. For each set of 36 bags that Harrington sold, he paid $300 back to Jones and kept $60 for himself.

On February 17, 2004, the jury found Jones guilty on both counts charged in the superseding indictment. He then filed post-trial motions challenging the district court's pretrial and trial rulings. Judge Pallmeyer denied both motions. On January 28, 2005, Jones was sentenced to 300 months in custody. He now appeals (1) the timeliness of his trial, (2) Agent Popovits's identification procedure, (3) the district court's jury instructions, and (4) the findings made at his sentencing.

## II.  Analysis

### A.  The Interstate Agreement on Detainers Act

Jones first argues that the District Court should have dismissed the charges against him because the government violated the Interstate Agreement on Detainers Act (IAD), 18 U.S.C.App. § 2. Because the IAD is a congressionally sanctioned compact, it is subject to federal construction. *See Alabama v. Bozeman*, 533 U.S. 146, 149 (2001). Whether the District Court erred in denying a motion to dismiss the indictment based on the application of the IAD is a question of law that we review *de novo. See United States v. Pardue*, 363 F.3d 695, 698 (8th Cir 2004).

The IAD is a multi-state agreement that is meant to "encourage the expeditious and orderly disposition of [outstanding] charges and determination of the proper status of any and all detainers based on untried indict- ments, informations, or complaints." Art. I, 18 U.S.C.App. § 2. A detainer is a notice filed with a prisoner's institution of incarceration alerting both he and the institution that the prisoner is wanted to face criminal charges in another jurisdiction. Practically, the detainer is a request that the prisoner be held for the other jurisdiction's prosecutors or that the holding institution notify the prosecutors of the prisoner's pending release. *See United States v. Paredes- Batista*, 140 F.3d 367, 372 (2d Cir. 1998). When a detainer

is so lodged, the defendant "shall be brought to trial within one hundred and eighty days after he *shall have caused to be delivered to the prosecuting officer and the appropriate court* of the prosecuting officer's jurisdiction written notice of . . . his request for a final disposition to be made of the indictment. . . ." IAD, art. III(a), 18 U.S.C.App. § 2 (emphasis added). The executed demand notifies the waiting jurisdiction of the prisoner's intent to exercise his right to a speedy trial. At issue here is whether the demand must actually be delivered to the prosecuting officer and the appropriate court, or if delivery to a supposed agent is sufficient. The trial court found the former. Jones argues for the latter.

The leading Supreme Court case on this matter, *Fex v. Michigan*, found that the IAD demanded actual delivery. 507 U.S. 43 (1993). Appellant Fex demanded a speedy trial pursuant to the instructions set forth on his detainer. He then submitted the request to the warden of his penal institution, who delayed in forwarding the document to the United States Attorney and the appropriate district court. Fex's legal proceeding did not begin within the demanded 180 days. In light of these facts, the Supreme Court interpreted IAD Article III(a) to mean that the 180-day clock does not start until the demand "has actually been delivered to the [district] court and prosecuting officer of the jurisdiction that lodged the detainer against him." *Id.* at 52. This decision was made in full consideration of the two "'worst-case scenarios'" presented by the varying interpretations. In the first case, by emphasizing actual delivery, the IAD language grants the careless or malicious warden the power to completely prevent the commencement of the 180-day period by failing to deliver the prisoner's demand. In the second case, were delivery to the warden by the inmate sufficient, negligence by the warden in forwarding the speedy-trial demand to the appropriate attorney would preclude prosecution "before the prosecutor even knows it

has been requested." *Id*. at 49-51. The Supreme Court found the latter scenario to be "significantly worse," and refused to dismiss the charges against Fex. *Id*. at 49.

Jones also chose to exercise his right to a speedy trial, but his detainer (Form USM-17) was never delivered to the U.S. Attorney or the district court. After executing his demand, Jones gave the document to the warden of his holding facility. The warden then forwarded the detainer to the U.S. Marshals' Office for the Central District of Illinois, which sent it to its counterpart in the Northern District. Where the detainer went from there, the record does not tell us. We do know, however, that the warden failed to follow the instructions on the detainer. Jones's executed Form USM-17 instructs the warden to "forward the detainer together with the Certificate of Inmate Status by registered or certified mail to the U.S. Attorney for the Northern District of IL and the U.S. District Court for the Northern District of IL." Trial Rec. 639.

Relying on agency theory, Jones argues that delivery occurred when the detainer was received by the Marshals' Office in the Northern District. Because the U.S. Marshal is the authorized agent for service, he reasons, we should find that it is the authorized agent for receipt, as well. To support this argument, Jones cites two Ninth Circuit rulings on the IAD's standards for delivery. The first is *United States v. Johnson*, 196 F.3d 1000 (9th Cir. 1999), where that Court held delivery to the U.S. Marshals' office was sufficient to satisfy the requirements of the IAD. *Johnson*, however, turned on the fact that the Form USM-17 executed by the prisoner specifically instructed the warden to return the document to the U.S. Marshals' office. *Id*. at 1002-03. The Ninth Circuit reasoned that while the document was a Marshals' Service form, it was the U.S. Attorney that was legally responsible for serving the detainer on the prisoner and they could not "both designate a manner for delivery and argue that delivery made in that

manner is invalid." *Id*. at 1003; *cf. Paredes-Batista*, 140 F.3d at 372-73 (finding 180-day speedy trial timeline not violated where detainer instructed warden to return executed form to the Marshals' Office). That is not this case. The language of Jones's Form USM-17 restated the Article III(a) language of the IAD and directed the warden to mail the document to the U.S. Attorney and the District Court. The warden simply failed to follow instructions.

*United States v. Collins*, 90 F.3d 1420 (9th Cir. 1996), is the second Ninth Circuit case to which Jones calls our attention. In *Collins*, the U.S. Attorney's Office conceded that delivery to the U.S. Marshal constituted delivery to the prosecuting officer. *Id*. at 1426. But in the instant case the U.S. Attorney contests this point, and the *Collins* concession carries no weight in our review. It means only that the Court was not called upon to determine both points of delivery. The Court did, however, reject appellant's argument that delivery to the U.S. Marshal was sufficient to satisfy delivery to the district court. Relying on *Fex*, the Ninth Circuit wrote that "[d]elivery to the Marshal . . . did not constitute delivery to the court because the Marshals are not agents for the court for purposes of accepting every request they find thrust upon them." *Id*.

The IAD, and the interpretation set forth in *Fex*, is literal: the executed detainer is "to be delivered to the prosecuting officer and the appropriate court." IAD Art. III(a), 18 U.S.C.App. § 2. This language does not contemplate authorized agents and Jones cannot show that his detainer was actually delivered to the U.S. Attorney or the District Court. While this may be a strict rule, the Supreme Court's decision in *Fex* explicitly contemplated a more egregious error on the part of the warden and found dismissal of the charges to be an inappropriate remedy. *See* 507 U.S. at 51-52.

### B. Eyewitness Identification

Jones next claims that the process by which Agent Popovits made his eyewitness identification was unduly suggestive, and this evidence should have been excluded from trial. The district court's decision to admit or suppress such an identification is subject to *de novo* review. *United States v. Harris*, 281 F.3d 667, 670 (7th Cir. 2002).

Eyewitness identification testimony violates a defendant's right to due process of law when it creates a "'very substantial likelihood of irreparable misidentification.'" *Neil v. Biggers*, 409 U.S. 188, 198 (1972) (quoting *Simmons v. United States*, 390 U.S. 377, 384 (1968)). To determine if such a violation has occurred, we must undertake a two-part analysis. First, we look to see if the identification process was unduly suggestive. *United States v. Rogers*, 387 F.3d 925, 936 (7th Cir. 2004) (citations omitted). Second, we review the totality of the circumstances surrounding the identification to determine if the identification is reliable irrespective of the suggestive procedure. *Id.*

In examining the identification process, we focus on the manner in which the witness was shown the suspect's likeness, reserving criticism for procedures that have been orchestrated to yield the identification of one particular suspect. *Gregory-Bey v. Hanks*, 332 F.3d 1036, 1045 (7th Cir. 2003); *United States v. Traeger*, 289 F.3d 461, 473-74 (7th Cir. 2002). For the most part, these suggestive procedures involve the repeated presentation of only one suspect by the police to a witness, or a lineup in which the suspect is clearly distinguishable from the other persons. *See Israel v. Odom*, 521 F.2d 1370 (7th Cir. 1975). Agent Popovits, however, worked independently to identify Jones from more than one hundred possible suspects. There were no other agents involved in his initial selection, which precludes an external, suggestive, influence on the process. Further, the CI, the only other person to have witnessed the transaction

for the law enforcement agents, was not involved in the identification process until after Popovits had made his selection. *See Gregory-Bey*, 332 F.3d at 1047.

Jones argues, however, that the use of the intelligence file was substantively flawed and that its repeated consultation conditioned agent Popovits to expect to see certain persons. In making this argument he relies primarily on *Israel v. Odom*, where we held that the repeated presentation of a single sketch was unduly suggestive. 521 F.2d 1370, 1373-74 (7th Cir. 1975). In *Odom*, we wrote that "'the display of pictures of the suspect *alone* is the most suggestive and therefore the most objectionable method of pre-trial identification.'" *Id*. (quoting *Kimbrough v. Cox*, 444 F.2d 9, 10 (4th Cir. 1971) (internal brackets omitted)) (emphasis added). But Jones's photograph was one of dozens reviewed by Popovits, and the record tells us that he looked at the intelligence file twice: once less than a month before the May 2 transaction, and again two days after the buy. These two viewings fall short of the psychological conditioning of which Jones complains.

Even assuming the procedure was suggestive, the totality of the circumstances indicate the identification was reliable. In making this determination, we consider five factors:

> (1) the opportunity of the witness to view the criminal at the time of the crime; (2) the witness' degree of attention; (3) the accuracy of the witness' prior description of the criminal; (4) the level of certainty demonstrated by the witness at the confrontation; and (5) the length of time between the crime and the confrontation.

*Gregory-Bey*, 332 F.3d at 1050 (citing *Biggers*, 409 U.S. at 199-200).

Agent Popovits is a trained law-enforcement agent whose sole purpose in entering the drug buy was to identify the people involved. He had a clear opportunity and time to view the defendant while making the purchase in the 340

building stairwell. During the buy he watched Jones complete the CI's order, he spoke directly with Jones to remind him how many bags he needed, and he paid Jones for the purchase. During this transaction, the two men stood face to face. Further, in his report made the day of the sale, Agent Popovits described Jones as being 6 feet, 1 inch tall, weighing 175 pounds. He erred only in overstating Jones's weight by five pounds. Additionally, Popovits testified to remembering Jones's droopy eye and puffy cheeks. Further, Popovits testified that when he identified Jones on May 11, nine days after the drug buy, he was one-hundred percent sure Jones was FNU LNU No.17. We cannot quibble with this certainty, and nine days is a relatively short delay.

Finally, because Jones failed to substantively address the adequacy of the in-court identification, we deem this issue waived. *See United States v. Johnson*, 859 F.2d 1289, 1294 (7th Cir. 1988) (holding pre-trial and in-court identification procedures subject to two separate inquiries).

## C. Jury Instructions

Jones directs his third challenge towards his jury instructions. He argues that the district court erred in not requiring the jury to find the exact amount of cocaine attributable to each defendant beyond a reasonable doubt. When the underlying question of error is one of law, we review a district court's choice of jury instructions *de novo*. *United States v. Macedo*, 406 F.3d 778, 787 (7th Cir. 2005).

At the conclusion of trial, Judge Pallmeyer submitted the Seventh Circuit Pattern Jury Instructions covering 21 U.S.C. §§ 841(a)(1) and 846, and a special verdict question for the conspiracy count against the defendant. The special question, to be answered only if the jury found the defendant guilty of participating in the conspiracy, asked them to determine if the offense involved one of the following

amounts of cocaine base: (1) less than five grams; (2) more than five grams, but less than 50 grams; or (3) 50 grams or more of cocaine base. The latter question ensures that the jury determines the relevant statutory maximum and minimum pursuant to the sentencing requirements of *Apprendi v. New Jersey*, 530 U.S. 466 (2000). As per our established jurisprudence, the district court is then free to make detailed findings at sentencing that do not disturb these statutory limits defined by the jury. *United States v. Knight*, 342 F.3d 697, 711 (7th Cir. 2003).

We have consistently held that drug quantities are not elements of the offense, and need not be found beyond a reasonable doubt. *See, e.g., Knox v. United States*, 400 F.3d 519, 522 (7th Cir. 2005); *United States v. Kibler*, 279 F.3d 511, 517 (7th Cir. 2002); *United States v. Brough*, 243 F.3d 1078, 1080 (7th Cir. 2001). Additionally, in *Knight*, we wrote that "[o]nce the jury determines the existence of the conspiracy, the defendants' participation in it, and assigns a type and quantity attributable to the conspiracy as a whole, it has established the statutory maximum sentence that any one participant in that conspiracy may receive," and thus, *Apprendi* is satisfied. 342 F.3d at 711. The jury instructions given in the instant matter fall squarely within the holdings of these cases.

Jones, however, relies on our decision in *United States v. Rivera* to argue that we have, *sub silentio*, turned a corner on the drug quantity and type as elements of the offense issue. 411 F.3d 864 (7th Cir. 2005). He is mistaken. Rivera was convicted of participating in a conspiracy to distribute more than five kilograms of cocaine. On appeal, she objected to the length of her sentence, arguing, *inter alia*, that she was a minor participant. In dicta, we suggested that it may have been proper to request a lesser-included-offense instruction, "so that the jury could determine whether Rivera's objectives were *less ambitious*, and her knowledge *less extensive*, than her confederates (who, the judge found,

actually distributed more than 150 kilograms or cocaine)." *Id.* at 866-67 (emphasis added). This suggested instruction was designed to provide the jury with an opportunity to choose between different drug quantities attributable to the defendant for the purpose of setting the statutory terms of the sentence, not for determining the ultimate question of guilt on the offense. Were we to reverse *Knox*, *Kibler*, *Brough*, *et al.*, we would choose a much more conspicuous manner to do so.

### D.  Sentencing

Lastly, Jones attacks his sentencing in three parts. First, that the district court's factual findings were clearly erroneous; second, that the district court improperly relied upon a prior conviction in imposing his sentence; and third, that his sentence violated the Due Process Clause of the Fifth Amendment and the Ex Post Facto Clause.

Jones claims that the district court arrived at his sentence after considering unreliable information and without making an explicit finding as to his drug quantity, offense level, and manner of calculating his sentence. We review a district court's factual findings at sentencing for clear error, *United States v. Trennell*, 290 F.3d 881, 891 (7th Cir. 2002), and reverse the district court only if, "after reviewing the entire record, we are left with the firm and definite conviction that a mistake has been made." *United States v. Cross*, 430 F.3d 406, 410 (7th Cir. 2005) (citations omitted). In conducting this review, we note that the district court "must make an explicit finding as to the drug quantity and the offense level and how it arrived at the sentence." *United States v. Fudge*, 325 F.3d 910, 920 (7th Cir. 2003).

Because Jones was convicted for conspiracy, the district court calculated his Guidelines range based upon the quantity of drugs he could have reasonably foreseen being distributed by the operation: 1.5 kilograms. *Rivera*, 411

F.3d at 866. Jones argues, under *Fudge*, that this aggregate amount was fashioned from conflicting testimony, and that the district court's ruling on the amount did not sufficiently resolve the conflict. 325 F.3d at 920; *United States v. McEntire*, 153 F.3d 424, 435 (7th Cir. 1998). He complains that the witnesses failed to agree on the exact day of the month the Gangster Disciples held Nation's Days or when and how often Jones sold crack. But this argument misses the point. During the sentencing hearing, the district court pointed out that while the witnesses" . . . might not have been specific about when nations days [sic] were, . . . nobody said there was no such thing as nations days [sic]. The testimony about what nations days [sic] were and why they were was wholly consistent." Sentencing Hr'g Tr. 39, Jan. 28, 2005. And it was this *why* that was important to Jones. It was the *why* that linked him to the greater conspiracy.

After weighing Jones's knowledge of the gang's collective drug sales, the district court calculated the 1.5 kilograms attributable to their efforts. In doing so, the district judge explicitly considered the credibility of Jerry Harrington and Willie Mobley. She noted that their testimony was consistent and corroborative, and sufficient to prove, beyond a reasonable doubt, that 1.5 kilograms was reasonably foreseeable to the defendant. Sentencing Hr'g Tr. 42, Jan. 28, 2005. Later in the Sentencing Memorandum, the court wrote:

> Even if, contrary to the testimony of several witnesses, Mr. Jones was not on the premises every day, his presence even occasionally surely would have permitted him to recognize the volume of GD crack cocaine sales. Even as few as two sales per day of 4.2 grams of crack would mean that the conspirators sold more than 1.5 kilograms of crack in a seven-month period. There was substantial credible testimony that on most if not all days, there were not just two, but dozens of such sales at the 340 Building.

Sentencing Memorandum, 4.

Lastly, pursuant to U.S.S.G. § 3B1.1(c), the district court gave Jones a two-point enhancement for being a Regent. Jones argues that the witnesses never agreed if Jones occupied this leadership role. At trial however, three witnesses testified that Jones had been a Regent; they disagreed only as to the timing of this distinction. The district court took these corroborating statements into account and discounted the contradictory testimony offered by Richard Epps. Further, the court noted that "Mr. Jones recruited others, and there was also testimony concerning persons who sold for Mr. Jones for at least a short period of time." Sentencing Hr'g Tr. 54, Jan. 28, 2005. The fact that he was found to occupy the role for a short while was reflected in the court's decision to add only two points under 3B1.1(c), not the three points requested by the government under 3B1.1(b). While the district court could have been more explicit in its findings regarding which testimonial evidence it was citing and why, after reviewing the record, we cannot say that we are left with the "'firm and definite conviction that a mistake has been made.'" *Cross*, 430 F.3d at 410.

Jones next argues the court erred by relying on a subsequently overturned conviction when determining his sentence. Were this the case, he would be entitled to a new sentencing hearing—defendants have a due process right to be sentenced on the basis of accurate information. *United States v. Tucker*, 404 U.S. 443, 447 (1972). But relief is only granted where the information before the sentencing court was inaccurate, and the court relied on the misinformation in passing sentence. *United States ex rel. Welch v. Lane*, 738 F.2d 863, 865 (7th Cir. 1984).

At the sentencing hearing, Jones made a statement seeking leniency from the district court. He denied being a gang member and explained that he was, instead, a "family man." Sentencing Hr'g Tr. 75, Jan. 28, 2005. The district court rejected this claim out of hand for two reasons. First,

the court noted that while he had a daughter, he had not been supporting her. Second, the court reviewed his prior conviction for the aggravated sexual abuse of a minor. This conviction, however, was later overturned by the Illinois Appellate Court. *People v. Jones*, No. 1-02-1623, slip op. (Ill. App. May 27, 2005).

That the sentencing court considered inaccurate information is not in doubt. But Jones cannot show that the inaccurate information was relied on in passing sentence. In *ex rel Welch v. Lane*, our definitive case on this matter, the sentencing judge mistakenly believed that one of the defendant's convictions for robbery was a conviction for armed robbery. The judge then noted that this (misconstrued) conviction was a "significant factor in the Court's determination of the sentence." 738 F.3d at 864. In the case before us, however, the sentencing court considered Jones's subsequently overturned conviction but gave it no significant consideration. The conviction was raised as a secondary attack on the assertion that he was a family man only after the judge initially noted that Jones failed to support his own daughter. Further indication that the prior conviction was not relied upon in sentencing is indicated by the judge's statement made before calculating the Guideline term: "What I have before me, though, *is not those other matters*. It's whether I should impose the guideline sentence [sic] that is based upon the offense conduct in this case." Sentencing Hr'g Tr. 78 (emphasis added).

Finally, we find Jones's argument that his sentence violated the Fifth Amendment Due Process Clause and the Ex Post Facto clause without merit. In *United States v. Jamison*, 416 F.3d 538, 539 (7th Cir. 2005), we held that *Booker*'s remedial holding offers no ground for an *ex post facto* claim. This ruling was recently reiterated in two of our opinions: *United States v. Farris*, 448 F.3d 965, 968 (7th Cir. 2006); *United States v. Hale*, 448 F.3d 971, 988-89 (7th Cir. 2006). Jones is correct in noting that we "have signaled no interest in reconsidering [this] rule." Def. R.Br. at 4.

### III. Conclusion

For the foregoing reasons we AFFIRM the decision of the district court.

A true Copy:

      Teste:

_____

*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*
