In the

# United States Court of Appeals
## For the Seventh Circuit

———————

Nos. 05-4509 & 05-4575

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

MALKIT "MIKE" SINGH and EKABAL "PAUL" BUSARA,

*Defendants-Appellants.*

———————

Appeals from the United States District Court
for the Eastern District of Wisconsin.
No. 03 CR 52—**William C. Griesbach**, *Judge.*

———————

ARGUED JANUARY 9, 2007—DECIDED APRIL 17, 2007

———————

Before BAUER, RIPPLE, and EVANS, *Circuit Judges.*

EVANS, *Circuit Judge.* The intriguing issue in this case is when does "transportation" begin in a prosecution under the Federal Kidnapping Act, 18 U.S.C. § 1201(a). Shortly, we will get into the facts which began in New Jersey, moved to tiny Francis Creek in Wisconsin, and wound up back in New Jersey. The events we will relate earned Malkit "Mike" Singh and Ekabal "Paul" Busara an indictment charging them with the kidnapping of Waheed Akhtar, during which his death occurred (count 1), the kidnapping of Akhtar's nephew, Mukaram Iqbal (count 2), and conspiracy to kidnap both Akhtar and Iqbal (count 3). A jury found Singh guilty on all three counts and Busara

entered a guilty plea to counts 2 and 3. Singh was sentenced to a term of 35 years. Busara received a life sentence. Both appeal.

Prior to 2002, Akhtar lived in New Jersey and worked at various Atlantic City casinos. He eventually purchased a gas station/convenience store (under the Citgo banner), called the Fun 'n Fast, in Francis Creek, a small town some 20 miles south of Green Bay just off the major interstate highway connecting that city to Milwaukee. In early 2002, Akhtar moved to Francis Creek and started operating the gas station. Temporarily leaving his family behind in New Jersey, Akhtar rented a small apartment in Francis Creek that was fairly close to the station.

In November 2002, Akhtar traveled to Pakistan for a family visit. Prior to leaving, he contacted Singh, whom he knew from his days in Atlantic City, and asked him to come to Francis Creek and manage the station while he was out of the country. Singh, who managed two gas stations in New Jersey, agreed and traveled to Wisconsin.

When Akhtar returned from Pakistan in January 2003, he and Singh discussed the possibility of Singh purchasing the Francis Creek station. A deal was struck, and Singh paid Akhtar $200,000 as a down payment toward the $300,000 purchase price. Trouble quickly followed.

Akhtar delayed signing the papers transferring the store and did not repay the down payment. Singh, understandably, became increasingly frustrated. And he was by now back in New Jersey and Akhtar was running the business in Wisconsin.

By February 28, 2003, Singh's frustrations boiled over. He asked a friend, Busara, to travel with him to Francis Creek to make final efforts to have Akhtar either complete the sale or pay back the $200,000. If Akhtar did not comply, Singh intended, with the help of Busara as the

"muscle," to kidnap Akhtar and force him to do one or the other.

Singh and Busara left Atlantic City on February 28 in a Nissan Pathfinder belonging to Singh's girlfriend, Aeyoung Kim. When they arrived in Wisconsin, they went to a Milwaukee-area Home Depot store where they purchased rope, a tarp, a crowbar, and gloves for use if the kidnapping became necessary.

The morning after arriving in the Francis Creek area, Busara and Singh went to the gas station. Akhtar was not there but they spoke with an employee, Haley Wagner. They told him they would return later that day.

Akhtar and Iqbal eventually arrived at the gas station to relieve Wagner. Wagner told them that Singh and Busara had been at the station and planned to return. Later that afternoon, when Singh and Busara returned, Singh and Akhtar again discussed the sale. Nothing was resolved. But Akhtar gave them the keys to his apartment so that they could continue the discussion there later that evening.

Around 5:30 p.m., Iqbal left the gas station and went to his uncle's apartment to eat and rest.[1] Singh and Busara were there when he arrived. After a few hours, Iqbal returned to the station to relieve Akhtar and Akhtar went to his apartment, intending to return to the station later to assist Iqbal in closing up for the night.

When Akhtar arrived at his apartment, he and Singh again discussed the sale of the business. The discussions soured and Akhtar went into his bedroom to take a nap. Singh, although frustrated, decided to spend the night

---

[1] Iqbal, who resides in Canada, was in Wisconsin for a visit with his Uncle Waheed.

and try again in the morning to convince Akhtar to sign the paperwork or return his $200,000.

After Akhtar went to bed, Busara became increasingly agitated. Pacing nervously up and down the hallway outside Akhtar's bedroom, Busara eventually said to Singh, "let's do it." Busara walked into Akhtar's room, made some noises to wake up Akhtar, and then climbed onto the bed and kneeled on Akhtar's chest. Busara next placed his knees on Akhtar's shoulders, pinning him to the mattress, and struck Akhtar's head with a 10-pound workout dumbbell. Akhtar was rendered motionless on the bed.

After the assault, Singh used the rope he and Busara had purchased at the Home Depot to restrain Akhtar's ankles and knees and to tie Akhtar's hands behind his back. During this time, Akhtar was lying on the bed. According to Singh's post-arrest statement, Akhtar was "breathing and bleeding." After they had "hog-tied" Akhtar, Busara and Singh moved him to the floor in the hallway, wrapped him in the tarp from the Home Depot, and carried him out of the apartment to the cargo area of the Pathfinder. Akhtar was still breathing "a little" when they wrapped him in the tarp and started to carry him to the car.

Singh and Busara then cleaned up some blood in the bedroom and flipped over the mattress to conceal a large blood stain. Using Akhtar's vehicle, the two made a 20-minute drive to Manitowoc to dispose of the bloody bedding and the dumbbell in a dumpster behind a Menard's store. They then returned to the Pathfinder.

But what to do with Iqbal, who knew they had been at Akhtar's apartment? To deal with that little problem, they drove in the Pathfinder to the gas station. When they arrived, they lied to Iqbal, telling him that Akhtar sent them to help Iqbal close up for the evening. At about 1:00

a.m., Singh asked Iqbal to come into the walk-in cooler. As Iqbal entered, Busara repeatedly struck him from behind. Singh joined in the attack as they knocked Iqbal to the floor and tied him up.

Singh and Busara cleaned up some spilled blood, snatched a surveillance tape and some money from the store, and took Iqbal, cut and bleeding from the assault, to the Pathfinder. Iqbal was unaware that Uncle Waheed was wrapped in a tarp in the Pathfinder's cargo area.

Busara and Singh then drove from Wisconsin to New Jersey. During the drive they threatened Iqbal, telling him his uncle was tied up in a hotel in Wisconsin and that they were doing this so they could get Akhtar's money.

The three arrived, after a long drive without a sleep-stop, in Atlantic City late on the evening of March 3, 2003. Busara called his brother's Indian restaurant and ordered food for the three of them. They then drove to a Quality Inn motel near Atlantic City, where Busara rented a room for the night. There, they ate and Singh called his girl-friend, Aeyoung Kim (the owner of the Pathfinder), and asked her to come and pick him up. Kim arrived at the motel in another car and Singh left with her—leaving the Pathfinder, with Akhtar's body still in the cargo area, in the motel parking lot. Busara stayed at the motel to guard Iqbal, and Singh and Kim went back to Kim's residence, where Singh began to disclose to her what had happened.

The next morning, Busara called his girlfriend, Christine Colosimo, and asked her to pick him up at the motel. Busara also called Kim's residence and asked Singh to come back to the Quality Inn.

Singh arrived at the motel, and he and Busara decided to move the Pathfinder to a nearby Coastal gas station, where Kim stored vehicles she used for her seafood business. Busara drove the Pathfinder (with Akhtar's body

still wrapped in a tarp in the cargo area), followed by Colosimo in her car. Meanwhile, Iqbal was moved to another hotel. He escaped when he was left alone for a short time. He called the police and told them what Singh and Busara had done to him.

At around the time that Iqbal escaped, Wagner (the clerk at the gas station in Francis Creek) reported to the local police that Akhtar was missing. In the late afternoon of March 4th, the Wisconsin and New Jersey investigations began to converge. The FBI was notified, and federal, state, and local law enforcement in Wisconsin and New Jersey began to work jointly on the investigation to locate Akhtar and arrest Singh and Busara.

The Manitowoc County Sheriff's Department (Francis Creek is in Manitowoc County) searched the Fun 'n Fast. In the walk-in cooler, they found blood, broken glass, and other evidence of a struggle. After comparing their information with information provided by Iqbal to the New Jersey authorities, the sheriff's department obtained a search warrant for Akhtar's Francis Creek apartment. During the initial search, the authorities found no evidence of a struggle. After Busara was arrested and confessed, however, Akhtar's apartment was searched a second time, and the police discovered the large blood stain on the underside of the mattress of Akhtar's bed. A small amount of blood splatter was also found on the wall above the headboard of the bed and on the carpet.

Meanwhile, Singh discovered that Iqbal had escaped, so he went to Jose Estrella's[2] apartment in Atlantic City. Estrella, a driver for Kim's seafood company, was a friend

---

[2] Estrella and the two girlfriends, Kim and Colosimo, were also indicted in this case for making false statements to government agents (counts 4 through 6 of the indictment). Those counts were severed and the cases transferred to New Jersey.

of Singh's. They were soon joined there by Kim and Busara. While there, Singh, Kim, and Busara discussed what to do with Akhtar's body, which was still in the Pathfinder, parked where Busara had left it at the Coastal gas station. According to Kim, Busara said that they had to bury the body.

They decided to dispose of the body at a storage facility where Kim rented a shed also for her seafood business. Once there, they dug a deep grave, carried Akhtar's body from the back of the Pathfinder, placed it in the grave, and covered it with dirt. Mission accomplished, Busara and Singh split up. Soon thereafter, Busara was arrested at his brother-in-law's New Jersey restaurant. Singh was arrested a few days later in Flushing, New York. Both separately confessed to most of the essential facts, with Busara spilling the beans and telling the authorities where Akhtar's body was buried.

As we said, the intriguing issue raised by this appeal is when does "transportation" begin under the statute. Depending on the answer, we can determine whether the jury instructions were proper and, if so, whether there is evidence to support a verdict based on those instructions. We review *de novo* the correctness of the jury instructions regarding the elements of an offense. *United States v. Jones*, 454 F.3d 642 (7th Cir. 2006).

The federal kidnapping statute is based on Congress's power to regulate interstate commerce. *Perez v. United States*, 402 U.S. 146 (1971). For that reason, to be a federal crime, kidnapping must involve moving the victim across state lines. For many years, the statute required that the victim was alive at the moment he was transported across a state line. *See*, *e.g.*, *United States v. Green*, 680 F.2d 520 (7th Cir. 1982); *United States v. Davis*, 19 F.3d 166 (5th Cir. 1994). Proving that a person was alive at that discrete moment, however, imposed a heavy bur-

den on the government. And in 1998, Congress amended the statute to eliminate the requirement that the victim be alive at the moment the state line is crossed. It now applies to anyone who unlawfully "seizes, confines, inveigles, decoys, kidnaps, abducts, or carries away" a person if that person is

> willfully transported in interstate or foreign commerce, regardless of whether the person was alive when transported across a State boundary if the person was alive when the transportation began[.]

So now what must be established is whether the victim was alive when the transportation began. In some sense, the difficulty for the government has simply been moved to another moment in time—"when the transportation began," whenever, as a legal matter, that occurs.

In answering that question, we "must first look to the language of the statute and assume that its plain meaning accurately expresses the legislative purpose." *United States v. Miscellaneous Firearms*, 376 F.3d 709, 712 (7th Cir. 2004), quoting *Grzan v. Charter Hosp. of Northwest Ind.*, 104 F.3d 116, 122 (7th Cir. 1997). Apparently, the meaning of the kidnapping statute is not plain to everyone, though an argument can be made that it should be.

That said, we acknowledge that in this case alone, several interpretations of the statute have been urged. At trial, Singh urged three alternate points at which transportation could be said to begin: first, when the vehicle in which the victim is placed enters a public highway; second, when the victim is placed in an automobile; and third, when he was removed from the apartment. Relying on a case from the Court of Appeals for the Fourth Circuit, the government contends that transportation begins with any movement of the victim. *United States v. Horton*, 321 F.3d 476 (2003). In this court, Singh relies on the dissent in *Horton* to argue that the question of whether

a defendant made a single journey that took him across state lines or made a stop or series of movements that broke the trip into multiple journeys was a question for a properly instructed jury. Under this view, the victim must be alive when the leg of the journey during which state lines are crossed begins. The dissent is useful to Singh because it means that transportation of Akhtar arguably could be said to begin only after the trip to Manitowoc to dispose of the bloody bedding, at which time Akhtar was almost certainly dead.

Assuming that the statute is ambiguous, we turn to its structure and purpose to determine its meaning. *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120 (2000). We start with the premise that Congress certainly did not intend to make proof of the crime more complicated, and thus more difficult, than it was under the prior statute—which is exactly what most of the possibilities cited by Singh do. By the amendment, Congress clearly signaled its intent to remove a barrier to prosecution under the statute by inserting the words "regardless of whether the person was alive when transported across a State boundary . . . ." Why would it then require that the victim be alive at some more or less arbitrary point along the way? We think it would not.

To the contrary, we agree with the court in *Horton* that the transportation of a victim begins when he or she is "willfully moved from the place of her abduction." At 481. To use any other point in time would, in fact, be arbitrary and would insert an unnecessary element of uncertainty into the statute. Why would the crime begin when, for instance, Singh and Busara started up the Pathfinder after they returned from disposing of the bloody bedding, rather than when they seized Akhbar? The moment Akhbar was seized, he was kidnapped. If he was alive at the moment he was moved, and if ultimately he

was taken across a state line, the federal kidnapping statute applies.

The instruction given by Judge Griesbach in this case is as follows:

> The government does not have to prove that Waheed Akhtar was alive when he crossed the Wisconsin boundary; it is sufficient if Akhtar was alive when the transportation began. Transportation begins within the meaning of the statute when a defendant moves the victim from one location to another as part of a plan or scheme that takes the victim to a place across the state line.

The instruction correctly states that transportation begins when the victim is moved. And by its verdict, the jury must have found that Akhtar was alive when he was moved from the bed onto the tarp in preparation for being placed in the Pathfinder for the trip to New Jersey.

During deliberations, the jury asked where transportation begins—when the body was moved to the tarp, or when it was rolled over and tying began. The judge stated:

> [T]ransportation means to carry from one place to another. To convey. Transportation of a victim for purposes of the Federal Kidnapping Act begins at the place, including a place within a residence, where the victim is seized, if the transportation from that place is part of a plan or scheme that takes the victim across the State boundary.

We find this instruction also to be in keeping with our view of the scope of the revised federal kidnapping law.

So, in this case, there was a properly instructed jury. The next issue is whether there was sufficient evidence that Akhtar was alive when transportation began. Our review of a claim based on the sufficiency of the evidence

is deferential. We view the evidence in the light most favorable to the government and affirm so long as a "rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Allen*, 383 F.3d 644, 646 (7th Cir. 2004).

The evidence was sufficient. First of all, Singh confessed to the kidnapping, and his confession was consistent with the physical evidence, including the location of the body, the location of the bloody bedding and dumbbell, the beating of Iqbal, the burying of the body, and Akhtar's injuries. As to the kidnapping itself, what Singh said was that he and Busara hog-tied Akhtar while he was still on the bed. They then moved him to the tarp on the floor. They rolled him in the tarp, bound the outside of the tarp, and carried him to the Pathfinder. Singh said that while they were tying him in the tarp, Akhtar was breathing and bleeding. Singh also said that as they carried Akhtar to the car, he was still breathing "a little."

Secondly, this evidence is consistent with the testimony of the expert witness for the government, Dr. Ian Hood. Dr. Hood testified that physical evidence found during the autopsy supported the inference that Akhtar had survived for at least several minutes following the beating. He said that the fracture Akhtar suffered from the blow on the head did not cause the kind of damage that would result in instantaneous death. In addition, a small amount of blood was found in Akhtar's lungs, which indicates that he had survived for some time after the blow to the head. Dr. Hood's analysis of the injury led him to conclude that it was not necessarily a fatal injury. He said that people with such an injury often live long enough to be organ donors, and a few actually survive. We find that, viewed in the light most favorable to the government, the evidence was sufficient to sustain the conviction.

The sentencing issues raised by defendant Busara are less intriguing, but nonetheless important. He claims that the district judge improperly calculated his advisory sentencing guideline range and that the life sentence imposed on him was not reasonable under the sentencing factors set out in 18 U.S.C. § 3553(a).

After *United States v. Booker*, 543 U.S. 220 (2005), we review criminal sentences for unreasonableness. If a sentence falls within the properly calculated range under the United States Sentencing Guidelines, it enjoys a rebuttable presumption of reasonableness. *United States v. Mykytiuk*, 415 F.3d 606 (7th Cir. 2005). We continue to review guideline calculations *de novo* and factual findings for clear error. *United States v. Ellis*. 440 F.3d 434 (7th Cir. 2006).

As to count 2, in which Busara is charged with the kidnapping of Iqbal, the district judge concluded that the proper sentencing guideline was § 2A1.1 and accordingly set the offense level at 43. We see no problem with the calculation. The calculation started with § 2A4.1(a), which at the time provided for a base offense level of 24 for kidnapping. However, if the victim (here Iqbal) was abducted in connection with or during an escape from another underlying offense and the base offense level for the underlying offense is higher, the higher offense level is applied. Iqbal's kidnapping was committed to cover up Akhtar's kidnapping and murder—a felony murder, which the application notes make clear is first degree murder, making the offense level properly calculated at 43.

Count 3 alleged a conspiracy to kidnap both victims. In calculating the guildelines for this count, Judge Griesbach applied the cross-reference in § 2A4.1(d)(1), which provides that the first degree murder guideline applies when the victim was killed under circumstances constituting murder under 18 U.S.C. § 1111. That section provides that

every murder "committed in the perpetration of, or attempt to perpetrate, any . . . kidnapping . . . is murder in the first degree." Again, the application of U.S.S.G. § 2A1.1 was correct.

Where we part company with the district judge is in his application of a 2-level enhancement for obstruction of justice under § 3C1.1. That section provides for an enhancement if the "defendant willfully obstructed or impeded . . . the administration of justice during the course of the investigation, prosecution, or sentencing . . . ."

The presentence report did not suggest that an enhancement for obstruction of the justice be imposed, nor did the government request one. When the judge suggested the enhancement might be appropriate, the government nimbly got on board. Ultimately, the enhancement was used to increase the offense level. The judge stated that "[b]urying the body conceals it in a way that leaving it in the back of a vehicle does not." He also stated that burying the body "during the investigation of the crime is concealing evidence of the crime."

The problem we see with the enhancement is that the act of burying the body can easily been seen as part of the ongoing conspiracy, rather than as an attempt to impede the investigation. Singh and Busara had continued to confine Iqbal until he escaped from the motel room. It was immediately after Singh discovered that Iqbal had escaped that he and Busara determined that they had to bury Akhtar's body. After that, when Busara learned the police were looking for him, he surrendered, confessed to his participation in the crime, and showed the police where the body was buried. Under these circumstances, we see burying the body as a part of the conspiracy, rather than as an attempt to obstruct justice. Therefore, we find that the enhancement for obstruction was improper.

The 2-level enhancement for obstruction, of course, infected the remaining guideline calculations. Because the guideline range was not properly calculated, we are unable to determine whether Busara's sentence was reasonable. *See United States v. Bokhari*, 430 F.3d 861 (7th Cir. 2005).

Accordingly, the judgment of conviction as to Malkit Singh is AFFIRMED; the sentence imposed on Ekabal Busara is VACATED and his case is REMANDED to the district court for resentencing.

RIPPLE, *Circuit Judge*, dissenting in part and concurring in the judgment in part. I agree with my colleagues that Mr. Singh has not demonstrated reversible error in his conviction, and I further agree with the court that Mr. Busara has demonstrated error sufficient to require resentencing in the misapplication of the obstruction of justice enhancement. I write separately, however, because I believe that Mr. Busara has demonstrated an additional error at sentencing that requires this court's attention. Specifically, Mr. Busara has invoked a line of this circuit's precedent that directs a sentencing court to consider whether the first degree murder guideline is appropriate when, as here, the court concludes that a defendant is responsible for an *unintentional* felony murder. In my view, the majority opinion gives insufficient attention to this aspect of his challenge, and, therefore, insufficient direction to the district court on resentencing.

As the majority opinion notes, before trial, Mr. Busara pleaded guilty to a charge of kidnaping Mukaram Iqbal,

the surviving victim, and a charge of conspiracy to kidnap both Iqbal and Waheed Akhtar. In exchange, the Government dropped the charge of kidnaping resulting in the death of Akhtar. In sentencing Mr. Busara, the district court began with the kidnaping guideline and arrived at the first degree murder guideline, resulting in a base offense level of 43, a result the majority opinion sanctions without much discussion. *See* slip op. at 12-13. I part company with the majority on this issue because I believe the district court, in calculating the appropriate offense level, failed to consider whether a departure from the first degree murder guideline was proper because the killing was unintentional.

## A. The Sentencing Calculations and Related Findings

In order to understand the district court's misstep in this regard, it is necessary to track with some precision the determinations made by the court to arrive at the ultimate sentence. At the sentencing hearing, before turning to the sentence calculation, the district court made the following statement in its findings:

> *It appears to me that what occurred here was not an intentional killing of Mr. Akhtar, at least as it started out.* They intended to kidnap him. When it didn't work, when they couldn't coerce him into signing the promissory note or providing the money, the decision was made then to take him. And they needed to incapacitate him to do so. They struck him. Mr. Busara, I find, inflicted the blow.
>
> He did so too hard. *He inflicted such a harsh blow that—he inflicted a fatal blow where presumably his intent was to knock Mr. Akhtar out,* and it is for that reason that they then tied up Mr. Akhtar, placed him

on a tarp, intending to take a live, but unconscious person out of the area and presumably make good on the plan to get him to cooperate ultimately and pay the money or sign the documents or whatever.

No other explanation makes sense. Why they would have tied him up if they thought he was dead right away makes no sense.

Sent. Tr. at 80-81 (emphasis added).

Turning to the actual guidelines calculation on the count related to the kidnaping of Iqbal, the district court began with the kidnaping guideline, U.S.S.G. § 2A4.1. The court then determined that the kidnaping of Iqbal was committed "during the commission of, or in connection with, another offense or escape therefrom," U.S.S.G. § 2A4.1(b)(7), that offense being the kidnaping of Akhtar. Following the directive of § 2A4.1(b)(7), the court determined that the appropriate base offense level should be borrowed from this related offense—the kidnaping of Akhtar. To calculate the appropriate offense level for the killing of Akhtar, the district court looked afresh at the kidnaping guideline, § 2A4.1. It concluded that, if Akhtar was killed "under circumstances that would constitute murder under 18 U.S.C. § 1111[1] had such killing taken place within the territorial or maritime jurisdiction of the United States," it would be appropriate to apply the kidnaping guideline's cross-reference, U.S.S.G. § 2A4.1(c), which directs the court to apply the offense level of the first degree murder guideline, § 2A1.1.

The court invited the parties to address the applicability of the cross-reference. Counsel for Mr. Busara clarified, "if

---

[1]  18 U.S.C. § 1111 provides that murder is killing with "malice aforethought"; it defines first degree murder to include felony murder and it also defines second degree murder.

I heard it correctly, I think what the Court said is that the version of the offense that Your Honor finds as being the reasonable one is that they didn't intend to kill him; they intended to subdue him and that the hit was too hard." Sent. Tr. at 90-91. On the basis of the finding that the killing was unintentional, counsel for Mr. Busara urged that, in applying the cross-reference, the court should not look to the first degree murder guideline, but to the second degree murder guideline. The court responded:

> You heard me correctly. . . . And I don't find evidence here—credible evidence that the intent in striking Mr. Akhtar was to kill him. That certainly was the effect. I don't think it makes any difference.
>
> . . . .
>
> I understand [defense counsel's] argument is that this is not first degree murder, and it would be probably anyhow because it was committed in the course of a kidnapping.
>
> First degree murder, of course, is defined in 18 U.S.C. [§] 1111. First and second degree murder actually is defined there. And if this crime was first or second degree murder, it would be—it would constitute murder under 18 U.S.C. [§] 1111, and therefore, the applicable Guideline would be 2A1.1. 2A1.1 is a 43.
>
> And this constitutes murder under [§] 1111, whether it was first or second degree murder. And it is certainly first degree murder because it is committed in the course of a kidnapping.
>
> [Section] 1111 reads, "Murder is the unlawful killing of a human being with malice [a]forethought." I note that malice [a]forethought does not require specific premeditation. That would be required for first degree

murder, but it is not required for second degree murder.

Malice [a]forethought includes evil intent; not necessarily to murder, but malicious intent. Clearly that was here. So this would, even with the kidnapping, would constitute a second-degree murder, so it would be murder under 18 U.S.C. [§] 1111.

But every murder perpetrated—and then it goes on to state, "In perpetration of or attempt to perpetrate the crime of kidnapping is a first degree murder." And I'm satisfied that this murder occurred in the course of an effort to perpetrate the crime or the conspiracy in this case—or the crime of kidnapping. It's relevant conduct, and therefore, 43 is the offense.

Sent. Tr. at 91-93. Having made the determination that the cross-reference was applicable, the court thus arrived at the first degree murder guideline's offense level of 43; after adding a multiple-count enhancement[2] and an obstruction of justice enhancement and subtracting levels for acceptance of responsibility, the resulting total offense level was 44.

## B.  Application Note 1

Mr. Busara urges this court to consider whether the district court erred in applying the cross-reference in § 2A4.1(c)(1) without first acknowledging that the ap-

---

[2] The court had arrived at an offense level of 43 for the conspiracy count "for the same reasons" as arriving at an offense level of 43 for the kidnaping count. Sent. Tr. at 97. The obstruction enhancement was applied to the conspiracy count, and the multiple-count enhancement was applied, without grouping, because the counts involved two victims.

plication notes permit a "departure" below that guideline for unintentional killings. At the time of the offense, Application Note 1 to § 2A1.1, the first degree murder guideline, provided:

> The Commission has concluded that in the absence of capital punishment life imprisonment is the appropriate punishment for premeditated killing. However, this guideline also applies *when death results from the commission of certain felonies. Life imprisonment is not necessarily appropriate in all such situations.* For example, if in robbing a bank, the defendant merely passed a note to the teller, as a result of which she had a heart attack and died, a sentence of life imprisonment clearly would not be appropriate.

> If the defendant did not cause the death intentionally or knowingly, *a downward departure may be warranted. The extent of the departure should be based upon the defendant's state of mind (e.g., recklessness or negligence), the degree of risk inherent in the conduct, and the nature of the underlying offense conduct.* However, the Commission does not envision that departure below that specified in § 2A1.2 (Second Degree Murder) is likely to be appropriate. Also, because death obviously is an aggravating factor, it necessarily would be inappropriate to impose a sentence at a level below that which the guideline for the underlying offense requires in the absence of death.

U.S.S.G. § 2A1.1, Application Note 1 (2003) (emphasis added).[3] In the Application Note, the Sentencing Commission recognizes that, by virtue of the cross-reference contained in § 2A4.1 and certain other similar guidelines

---

[3] Subsequent amendments to the guidelines restructure this section and it now appears, with minor modifications, in Application Note 2.

provisions (which sweep certain second degree murders into the first degree guideline), and by virtue of the classification of felony murder as murder in the first degree, many non-intentional, non-premeditated killings result in a life sentence under strict application of the guideline; a district court is empowered, indeed, directed to consider whether the mental state of the defendant justifies using a less severe starting point in the sentencing calculus. Mr. Busara contends that, because the district court failed to consider Application Note 1, it erroneously determined that it was bound to arrive at the full offense level under the first degree murder guideline because the death of Akhtar occurred in the course of a felony.[4]

As an initial matter, when the Note is applicable, it directs the sentencing court to consider a "downward departure." Recent precedent from this court, of course, notes that post-*Booker*, the concept of departures is "obsolete." *See, e.g.*, *United States v. Filipiak*, 466 F.3d 582, 584 (7th Cir. 2006). The "departure" involved in this case, however, relates to the proper application of the guidelines in determining the offense level, not a departure from a properly calculated sentencing range. Therefore, the present issue is analyzed more properly as part of our de novo inquiry into whether the guidelines were properly applied. *See United States v. Scott*, 405 F.3d 615, 617 (7th Cir. 2005) ("The Sentencing Reform Act requires

---

[4] As has been made clear by the foregoing discussion, Mr. Busara urged the district court to adopt something lower than the first degree murder guideline because the court had made a finding that the killing was unintentional. At oral argument, Mr. Busara conceded that he did not make specific reference to Application Note 1 directly to the district court; however, the Government does not suggest that our review of the appropriate guidelines calculation is other than de novo, *see* Appellee's Br. at 29-30.

resentencing when the challenged sentence was 'imposed as a result of an incorrect application of the sentencing guidelines.' 18 U.S.C. § 3742(f)(1). This provision survived *Booker*. *See* [543 U.S. 220, 258-60,] 125 S. Ct. [738,] 764 (2005). An incorrect application of the guidelines requires resentencing under the post-*Booker* sentencing regime."). Further, "[i]t is well established that '[a]n application note is binding authority unless it violates the Constitution or a federal statute, or is inconsistent with, or a plainly erroneous reading of that Guideline.'" *United States v. Stitman*, 472 F.3d 983, 987 (7th Cir. 2007) (quoting *United States v. Dyer*, 464 F.3d 741, 743 (7th Cir. 2006)).

The particular Application Note at issue in this case has been the subject of several prior sentencing challenges in this court. In a series of cases beginning with *United States v. Prevatte*, 16 F.3d 767, 784-85 (7th Cir. 1994), this court emphasized the duty of the district court, in imposing a sentence for first degree murder, to consider whether the use of the full base offense level for first degree murder was appropriate in instances of non-intentional killings consistent with Application Note 1.

In *Prevatte*, the defendants had used pipe bombs to create diversions for burglaries; the explosion of one of those bombs killed an elderly woman outside her home. The district court had applied the first degree murder guideline and sentenced the defendants to life imprisonment. We overturned the life sentence because the district court had not applied "the directives of the Sentencing Commission in Application Note 1 to § 2A1.1." *Id.* at 784.[5]

In *United States v. Martin*, 63 F.3d 1422 (7th Cir. 1995), *abrogated in part on other grounds by Jones v. United*

---

[5] We simultaneously rejected the sentence on the alternate ground that under the relevant statute, a jury recommendation was required before a life sentence could be imposed. *United States v. Prevatte*, 16 F.3d 767, 784 (7th Cir. 1994).

*States*, 529 U.S. 848 (2000), after determining on other grounds that resentencing was required, we again noted the relevance of Application Note 1. We noted that "there [was] no indication that the [district] court considered the defendant's mental state or any other grounds for departure" authorized by the note, and noted that on remand the court "may depart . . . should it find appropriate reasons therefor." *Id.* at 1435.

More recently, in *United States v. Thomas*, 280 F.3d 1149 (7th Cir. 2002), we evaluated a challenge to a sentence imposed under the first degree murder guideline without sufficient findings of premeditation, or, in the alternative, without specific findings supporting felony murder as first degree murder. After concluding that the court erred in not making such findings, we continued,

> [a]dditionally, there is nothing in the record to suggest that the district court recognized that it had the option under Application Note 1 to § 2A1.1 to depart downward from life imprisonment. *See Prevatte*, 16 F.3d at 784-85 (holding that when felony murder provides the basis for the sentence enhancement, a district court's failure to make findings as to the defendant's mental state to determine if a departure down from life imprisonment required a remand). Therefore, the district court's selection of first degree murder under a felony murder theory cannot stand.

*Thomas*, 280 F.3d at 1158.

The thrust of these cases is that, because the Notes are binding authority, and because they authorize the court to exercise discretion not only in imposing a sentence but in calculating the guidelines range, a sentencing court is under an obligation to *consider* whether circumstances warrant a downward departure from the first degree murder offense level. In *Prevatte*, the error of the district court had been its failure to "undertake further

analysis of the mental state of each defendant." 16 F.3d at 784. In the case before us, the court *did* make an inquiry, and indeed, repeatedly made a finding on the record that the killing was *not* intentional or premeditated. It nonetheless failed to acknowledge that it had discretion *not* to apply that offense level and indeed used language that strongly suggested it was *bound* to that guideline under the circumstances. Sent. Tr. at 91 ("And I don't find evidence here—credible evidence that the intent in striking Mr. Akhtar was to kill him. . . . I don't think it makes any difference."); Sent. Tr. at 92 ("And if this crime was first or second degree murder, it would be—it would constitute murder under 18 U.S.C. [§] 1111, and therefore, the applicable Guideline would be 2A1.1.").

This approach is inconsistent with our precedent, as outlined above. Although Application Note 1 does not *require* the district court to adjust downward Mr. Busara's offense level as a necessary consequence of the finding that the killing was unintentional, it invests the court with discretion to do so, and our precedent imposes an obligation on that court to affirmatively consider its option in this regard. A sentencing court, therefore, should acknowledge its authority under the Note; particularly when, as here, a finding as to lack of intent to kill has been made, the sentencing court should make a further determination on the record as to whether such an adjustment would be appropriate.[6]

---

[6] I acknowledge that the court had the authority to *depart* from a properly-calculated guidelines sentence and chose not to do so. I cannot say, however, that the same considerations necessarily would animate a decision regarding *proper calculation* of the guidelines range as opposed to a decision that no departure from a *properly calculated* guidelines range is appropriate. The error in failing to consider Application Note 1, is, therefore, not

(continued...)

A true Copy:

Teste:

_____
*Clerk of the United States Court of
Appeals for the Seventh Circuit*

---

[6] (...continued)
harmless despite the considerable discretion now afforded to
sentencing courts.

---